**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| LINDA HUME,  )  <br>           Plaintiff,  )  <br> )  <br> )  <br>     v.  )  <br> )  <br> CAROLYN W. COLVIN,[1]  )  <br> Acting Commissioner,  )  <br> Social Security Administration,  )  <br>           Defendant.  )  <br> )  | **CIVIL ACTION**  <br> **NO. 11-40114-TSH** |

## REPORT AND RECOMMENDATION

**January 21, 2014**

Hennessy, M.J.

The Plaintiff, Linda Hume, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), or, in the alternative, remand to the Administrative Law Judge ("ALJ").[2] (Docket #10). The Commissioner seeks an order affirming her decision. (Docket #13).

By Order of Reference dated May 17, 2013, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #19), this matter was referred to me for a Report and Recommendation on these two motions which are now ripe for adjudication.

---

[1] Under Fed. R. Civ. P. 25(d), as of February 14, 2013, Carolyn W. Colvin is substituted for Michael J. Astrue, the former Commissioner of the Social Security Administration.

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this Report and Recommendation should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

For the reasons that follow, I RECOMMEND that Plaintiff's Motion to Remand (Docket #10) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #13) be ALLOWED.

I.  BACKGROUND

A.  Procedural History

Hume protectively filed an application for DIB and an application for SSI on September 29, 2008, alleging in both that she had been disabled since March 4, 2008. (Tr. 106-14). Her applications were initially denied on January 13, 2009. (Tr. 52). Hume filed a Request for Reconsideration, which was denied on June 2, 2009. (Tr. 57). On June 16, 2009, Hume filed a Request for a Hearing before an ALJ. (Tr. 63). On January 4, 2011, a hearing was held before ALJ Addison C.S. Masengill via videoconference. (Tr. 22). Hume, represented by counsel, and a vocational expert retained by the Commissioner appeared and testified at the hearing. (Tr. 24-42). On January 14, 2011, the ALJ rendered a decision unfavorable to Hume. (Tr. 4-15).

The ALJ found that Hume had not been disabled from March 4, 2008, through the date of the decision. (Tr. 8). Although the Decision Review Board selected Hume's claim for review, the ALJ's decision was effectively affirmed because the Decision Review Board did not act within the requisite ninety-day period. (Tr. 1). Having timely pursued and exhausted her administrative remedies before the Commissioner, Hume filed a Complaint in this Court on June 22, 2011, pursuant to 42 U.S.C. § 405(g). (Docket #1). Hume filed the Motion for Reversal or Remand on October 5, 2011, (Docket #10), and the Commissioner filed a cross-motion on December 16, 2011, (Docket #13).

B.  Medical History

On March 29, 2008, Hume presented to the Heywood Hospital emergency room complaining of seizure activity. (Tr. 222-25). In 2001, she had been diagnosed with a seizure disorder, and her last seizure prior to the March 29, 2008 episode, was in September 2007. (Tr. 225). At Heywood Hospital, Hume was observed, treated with 10 mg of Valium, and transferred for a neurological evaluation. (Tr. 224, 227). She was hospitalized at UMass Memorial for one week. (Tr. 247, 265). Hume had continuous EEG video monitoring from April 2, 2008 to April 3, 2008, which did not disclose any electrographic correlates to seizure events, although she experienced a number of non-epileptic seizures during this period. (Tr. 266). As there was no evidence of electrographic seizure during the seizure episodes, it was determined that Hume was most likely not in fact having seizures, her medications were discontinued, and she was discharged. (Tr. 266). It was recommended that Hume seek out-patient counseling to help reduce the seizure events. (Id.). Hume continued to take Trileptal because the drug improved her symptoms. (Tr. 239, 247).

On April 8, 2008, Hume had a post-discharge visit with her primary care physician, Dr. Michelle Pugnaire. (Tr. 353). Dr. Pugnaire informed Hume that her diagnosis of non-epileptic seizures did not pose limitations to her health, well-being, or ability to work or to return to work, and she gave Hume a note to return to work the following week. (Id.). Dr. Pugnaire also advised Hume to follow up with a neurologist. (Id.).

Hume met with neurologist Dr. Lloyd M. Alderson on May 1, 2008. (Tr. 239). Dr. Alderson had first treated Hume on August 10, 2006, at which time he started her on a dose of Trileptal.[3] (Tr. 258-59). At the May 1, 2008 appointment, Dr. Alderson noted that Hume was "alert and coherent. Her cranial nerves are all intact. She has good strength in all four

---

[3] Dr. Alderson followed up with Hume on October 12, 2006, continuing her on the Trileptal. (Tr. 249).

3

extremities and a normal gait." (Tr. 239). Dr. Alderson expressed some uncertainty about treatment as "[Hume's] seizures, at least in part, may be psychogenic. They were associated with going back to work."[4] (Id.). On May 29, 2008, at a follow-up appointment, Dr. Alderson noted that Hume was on a regimen of Lamectil and Trileptal. (Tr. 236). Dr. Alderson encouraged Hume "to try to resume her life and get back to work." (Id.).

On July 15, 2008, Hume reported to Dr. Pugnaire that her symptoms had improved significantly, although she continued to experience brief spells of jerking. (Tr. 349). Dr. Pugnaire noted that Hume had not reported to work, at her employer's direction, and that Hume would follow up with Dr. Alderson regarding her return to work. (Id.).

Hume followed up with Dr. Alderson on September 4, 2008. (Tr. 264). Dr. Alderson noted that Hume seemed to be "about the same" as when he last saw her. (Id.). He reiterated that it was not clear whether the seizures "represent a purely psychogenic phenomenon." (Id.). He continued her treatment regimen and asked Hume to follow up with him in three months. (Id.).

On September 30, 2008, Hume completed a disability report. (Tr. 148-56). Hume stated that she was unable to work due to seizure disorder and related complications, including a right hand tremor, numbness on the right side of her face, and numbness in her right arm, right hand, and right leg. (Tr. 149). She indicated that her seizures caused confusion about three times per day and that she experienced seizures, which lasted from thirty seconds to almost an hour, two to three times a week. (Id.). Hume stated that the seizures kept her from concentrating, speaking clearly, and accurately using words and caused dizziness and a spacey feeling. (Id.).

---

[4] "Psychogenic" is defined as "originating in the mind or in mental or emotional conflict." MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/psychogenic?show_0&t=1389808818 (last accessed Jan. 15, 2014).

In a function report completed on October 16, 2008, Hume stated that she helped her granddaughter get off the bus and do her homework, let her dogs in and out on occasion, and had no problems with personal care needs. (Tr. 165-72). Hume indicated that she was able to prepare meals and perform housework at her own pace, walk, shop, and handle her personal finances. (Tr. 167-68). Hume stated that she enjoyed jewelry-making, knitting, and sewing and attended church on a regular basis. (Tr. 169). She reported that she could not lift over twenty-five pounds and had problems squatting, bending, standing, walking, and climbing stairs. (Tr. 170, 172). Hume also reported that, when she experienced a seizure, she had difficulty completing tasks, remembering, and concentrating. (Tr. 172).

On November 6, 2008, Dr. Malin Weeratne assessed Hume's physical residual functional capacity ("RFC"). (Tr. 302-09). Dr. Weernate based her assessment on the fact that Hume was independent, used no assistive devices, had no problems with chores, went out, and did not drive. (Tr. 303). She noted that Hume suffered from seizures attributed to psychogenic causes and was being treated with Trileptal and Lamictal. (Tr. 304). Dr. Weeratne found no limitations in Hume's ability to lift, carry, stand, walk, sit, push, or pull. (Tr. 303). She found that Hume could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb a ladder, rope, or scaffold. (Tr. 304). Dr. Weeratne also concluded that Hume should avoid even moderate exposure to hazards such as machinery and heights.[5] (Tr. 306).

In accordance with Dr. Alderson's advice in September 2008 that Hume follow-up with him in three months, Hume met with Dr. Alderson on December 4, 2008. (Tr. 314). Hume stated that, beyond occasionally experiencing some migraine headaches and seeing some flashing lights, nothing in her condition had changed. (Id.). Dr. Alderson found that Hume was

---

[5] On May 21, 2009, Dr. Elaine Hom, after reviewing Hume's records, affirmed Dr. Weerante's assessment. (Tr. 360).

doing fairly well from the standpoint of her episodic mental status changes. (Id.). He continued her current medicines and prescribed Fioricet for her occasional headaches. (Id.). Dr. Alderson directed Hume to follow up with him in six months. (Id.).

On December 31, 2008, Dr. Milton Taylor conducted a psychodiagnostic interview of Hume. (Tr. 318-22). Hume indicated that she had seizures about two to three times weekly and that her last seizure had occurred a few days prior. (Tr. 318). Dr. Taylor reported that Hume was cognitively capable of performing a full range of activities of daily living, but that her seizure disorder limited the performance of rigorous household activities. (Tr. 320). Hume explained that her medication caused fatigue and sometimes confusion, and that she often napped in the afternoon. (Id.). Dr. Taylor noted that Hume's social skills were unimpaired and that she communicated quite well. (Id.). Dr. Taylor administered the Mini-Mental Status Exam and Hume obtained a perfect score. (Tr. 321). Dr. Taylor stated that "[t]here is no evidence to suggest any psychological factors affecting [Hume's] general medical condition."[6] (Id.).

Dr. Pugnaire completed a convulsive disorder questionnaire for Hume on April 28, 2009, noting that Hume had experienced non-epileptic seizures since March 2005. (Tr. 339).

On June 4, 2009, two days after her request for reconsideration of the denial of her application for DIB and SSI, Dr. Alderson completed a Seizures RFC questionnaire for Hume. (Tr. 361-65). He responded as follows. He had seen Hume two or three times a year for two years. (Tr. 361). Her diagnosis was a seizure disorder and depression. (Id.). She suffered localized complex and partial seizures three times a week; these seizures lasted two to three minutes. (Id.). Hume did not always have notice of an impending seizure. (Tr. 362). The seizures did not occur at a particular time of day. (Id.). Stress and bright lights were

---

[6] On January 5, 2009, Dr. Ginette Langer reviewed Dr. Taylor's report and found that Hume did not have a medically determinable impairment. (Tr. 323-36). On May 15, 2009, Dr. Lawrence Langer affirmed Dr. Ginette Langer's opinion. (Tr. 359).

6

precipitating factors. (Id.). Hume experienced confusion, exhaustion, and severe headaches for hours following the seizures. (Id.). Hume was unable to drive or shop because of seizures. (Tr. 363). Hume's seizures were likely to disrupt the work of co-workers. (Tr. 364). Hume would require more supervision at work than an unimpaired worker. (Id.). Hume suffered from depression, a short attention span, and memory problems. (Id.). Hume was incapable of even "low stress" jobs and that her impairments would cause her to be absent from work more than three times a month. (Tr. 364-65).

Eighteen months later, and two weeks before the hearing before the ALJ, on December 23, 2010, without conducting a further examination, Dr. Alderson re-signed the questionnaire, noting that there were no changes. (Tr. 370).

Hume testified at the ALJ hearing on January 4, 2011 that she suffers from petit mal seizures two to three times a week. (Tr. 29). She stated that the seizures lasted from one to almost five minutes and that afterwards she experienced a severe headache and exhaustion. (Tr. 29, 38). Hume testified that it takes about a day to recover from a seizure and during recovery sound and light bother her so she lies in a dark room. (Tr. 29). Hume stated that the residual effects of the seizures include confusion, loss of words, and numbness in the right side of her face, her right arm and hand, and her right leg. (Tr. 29-30). The side effects of her medications include acid reflux, confusion, and, potentially, headaches. (Tr. 30-31).

At the time of the ALJ hearing, Hume was 52 years old. (Tr. 24). She had attended one semester of college and reads and writes in English. (Id.). She is married and lives with her husband, her daughter, and her nine-year-old granddaughter. (Tr. 25). Hume has a driver's license, but has not driven regularly since March 2008. (Id.). Hume's employment history consisted of work as an office manager in a travel agency and a loan processor. (Tr. 26-27).

C.      Administrative Decision

In assessing Hume's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits.  See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether he or she is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).  The ALJ found that Hume had not engaged in substantial gainful activity since March 4, 2008.  (Tr. 9).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ determined that Hume had the severe impairment of seizure disorder. (Tr. 9).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled.  Id.  The ALJ found that Hume did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment. (Tr. 10).

At the fourth step, the ALJ considers the claimant's RFC and the claimant's past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC.  20 C.F.R. § 404.1520(e).  An individual's RFC is her ability to do physical and

mental work activities on a sustained basis, despite limitations from her impairments. 20 C.F.R. § 404.1545(a)(1). Here, the ALJ found:

> [Hume] has the residual functional capacity to perform a full range of work at all exertional levels but would be limited to no more than frequent grasping, pinching or twisting with the right (dominant) hand or arm, would be incapable of any overhead lifting or reaching, incapable of performing activities requiring foot/leg controls, would need to avoid all exposure to ladders, ropes, scaffolds, dangerous moving machinery, heights, flashing lights and loud/noisy environments, would be incapable of driving and would be limited to simple, unskilled tasks.

(Tr. 10). The ALJ determined that Hume's RFC precluded a return to any past relevant work. (Tr. 14).

At the fifth step, the ALJ asks whether the claimant's impairments prevent her from performing other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ determined that, based upon her RFC and the testimony of the vocational expert, jobs exist in significant numbers in the national economy that Hume can perform, including information clerk, packaging, sorter, and inspector. (Tr. 14-15). Accordingly, the ALJ found that Hume was not disabled at any time from March 4, 2008, through January 14, 2011. (Tr. 15).

II.     STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by

substantial evidence. <u>Irlanda Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 770 (1st Cir. 1991).

III. ANALYSIS

Hume challenges the ALJ's determination that jobs that she could perform exist in significant numbers in the national economy. Specifically, she argues that the ALJ erred by affording insufficient weight to the Seizures RFC questionnaire completed by her treating neurologist, Dr. Alderson, and because the ALJ's hypothetical to the vocational expert did not consider all of Hume's limitations. (Docket #11 at 3-8).

A. Treating Physician's Opinion

Hume argues that the ALJ erred in failing to give controlling weight to Dr. Alderson's June 4, 2009 opinion, expressed in the Seizures RFC questionnaire, which he reaffirmed on December 23, 2010. (Docket #11 at 3). Hume asserts that Dr. Alderson's opinion was not inconsistent with Hume's longitudinal history and that it was not inconsistent with Hume's daily activities. (Docket #11 at 4-7).

A treating physician's opinion as to the nature and severity of a claimant's impairments is entitled to controlling weight if it is consistent with "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If an ALJ determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must give "good reasons" supporting his decision. <u>Id.</u> When an ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must consider the following factors to determine what weight to actually give the opinion: the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; the opinion's supportability; the consistency of the opinion with the

record as a whole; the treating source's area of specialization; and any other relevant factors. 20 C.F.R. § 404.1527(c)(2)-(6); see Ramos v. Barnhart, 119 Fed. Appx. 295, 296 (1st Cir. 2005) (holding that ALJ need not give treating physician's opinion controlling weight when it was inconsistent with the bulk of medical evidence and not supported by progress notes or clinical or laboratory findings); Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (holding that ALJ was not required to give treating physicians' opinions controlling weight where they relied excessively on claimant's subjective complaints, rather than on objective medical findings).

Dr. Alderson's assessment found that Hume's seizure disorder caused her to experience confusion, exhaustion, and severe headaches for hours following seizures, which occurred approximately three times a week. (Tr. 361-62). It indicated that Hume suffered from depression, a short attention span, and memory problems. (Tr. 364). It also indicated that Hume's seizures were likely to disrupt the work of co-workers and that Hume would require more supervision at work than an unimpaired worker. (Id.). It concluded that Hume was incapable of even "low stress" jobs and that her impairments would cause her to be absent from work more than three times a month. (Tr. 364-65).

The ALJ determined that Dr. Alderson's opinion did not merit controlling weight as to the extent of Hume's disability based on inconsistencies with Dr. Alderson's own treatment notes, Hume's daily activities, and Hume's overall treatment regimen. (Tr. 13-14). The ALJ clearly stated his reasoning:

> To the extent her treating source [has] assessed much greater limitations, including being absent from work greater than three times per month, thereby finding the claimant disabled from all substantial gainful activity as reflected in [the Seizures RFC Questionnaire], these assessments are inconsistent with the longitudinal history noted above, including his own treatment notes, which effectively end in September 2008 . . . , inconsistent with the claimant's ability to

perform a wide range of daily activities without problem, inconsistent with the overall treatment regimen and appears to be based upon the claimant's subjective allegations rather than objective findings.[7]

(Id.).

The ALJ supportably deemed Dr. Alderson's opinion inconsistent with the medical evidence of record, including Dr. Alderson's own treatment notes. In those notes, Dr. Alderson stated several times that Hume's seizures may be psychogenic. (Tr. 236, 239, 264, 314). He noted that they were associated with going back to work. (Tr. 239). When he saw Hume on May 29, 2008, Dr. Alderson "encouraged her to try to resume her life and get back to work." (Tr. 236). Dr. Alderson also observed that Hume was doing well on her medical regimen. (Tr. 236, 264, 314). Indeed, it was only after Hume applied for benefits, and had an incentive to over-state her condition, that Dr. Alderson issued the opinion in the Seizures FRC questionnaire that is inconsistent with his prior treatment notes. Dr. Pugnaire's notes are also inconsistent with Dr. Alderson's opinion. On April 8, 2008, Dr. Pugnaire informed Hume that her condition did not jeopardize her health and well-being, or limit her ability to work or return to work. (Tr. 353). Dr. Pugnaire gave Hume a note to return to work the following week.[8] (Id.). Lastly, statements Hume herself made cannot be squared with Dr. Alderson's opinion. Less than three months

---

[7] Hume testified that she remains a patient of Dr. Alderson and that she last saw him in October or November of 2010. (Tr. 33). She asserts that if the ALJ had an issue with not having current office notes from Dr. Alderson, such was never raised at the hearing. (Docket #11 at 4). However, the ALJ's decision does not indicate that the lack of treatment notes after September 2008 had any bearing on his findings. Hume does not assert that anything in these notes would lend any additional support to Dr. Alderson's opinion on her functional limitations.

[8] Hume asserts that the ALJ erred by giving greater weight to the opinion of Dr. Pugnaire, Hume's primary care physician, than Dr. Alderson, Hume's neurologist, as to her condition and its residual effects. (Docket #11 at 5). Generally, more weight will be given to the opinion of a specialist on medical issues related to his area of specialty than to the opinion of a non-specialist. 20 C.F.R. § 404.1527(c)(5). However, contrary to Hume's argument, the ALJ did not place more weight on Dr. Pugnaire's records; rather, the ALJ used Dr. Pugnaire's notes to highlight the internal inconsistencies in Dr. Alderson's positions pre- and post-application for benefits, such as Dr. Alderson's own treatment pre-application notes stating that Hume should try to get back to work and his post-application opinion that she would be incapable of even "low stress" jobs.

before applying for benefits, Hume reported to Dr. Pugnaire on July 15, 2008, that her symptoms had improved significantly.

The ALJ also properly determined that Hume's ability to perform a wide range of daily activities was inconsistent with Dr. Alderson's opinion. The ALJ accurately noted that:

> In a function report, the claimant stated she provided childcare to her granddaughter and provided care to her pets, had no problems sleeping at night and no problems with personal care needs. The claimant stated she was able to prepare meals, perform household chores at her own pace, walk, shop, and handle personal finances without difficulty. The claimant stated [she] enjoyed reading, jewelry[-]making, knitting and sewing, enjoyed socializing with others and attended church on a weekly basis[.]

(Tr. 11; see Tr. 165-72). The ALJ then inferred that these activities reflected a level of activity that was inconsistent with Dr. Alderson's opinion. (Tr. 13). Hume asserts that the ALJ misinterpreted the Function Report as the ALJ did not reference the difficulties that Hume experiences in undertaking these activities, which were also noted on the report. (Docket #11 at 6). However, review of the Function Report reveals that the ALJ's interpretation was permissible, as the Function Report clearly states that Hume could undertake the activities noted by the ALJ. See Rodriguez Pagan, 819 F.2d at 3 ("We must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.").

Finally, the ALJ also properly found that Dr. Alderson's opinion was inconsistent with Hume's overall treatment regimen. Since 2008, Hume's treatment has been fairly conservative and her providers' treatment notes indicate improving symptoms and a plan to continue her on prescribed medications. (Tr. 236, 264, 314, 349). The ALJ could permissibly conclude that if Hume were as disabled as Dr. Alderson opined, her treatment regimen would have been more aggressive and thereby reflect an incapacitating disability.

The ALJ gave detailed reasons for rejecting Dr. Alderson's assessment as inconsistent with other evidence in the record. After reviewing the evidence cited by the ALJ, I am persuaded that the ALJ was not required to give Dr. Alderson's assessment controlling weight. See Rodriguez, 647 F.2d at 222 ("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the ALJ], not for the doctors or for the courts.").

B. Hypothetical Given to Vocational Expert

At the hearing, the ALJ posed three hypotheticals to the vocational expert. (Tr. 40-42). The second hypothetical tracks the RFC that the ALJ ultimately determined Hume possessed.[9] (Tr. 10, 42). With respect to this hypothetical, the vocational expert testified that, although Hume could no longer perform past work, there were jobs that she could perform that existed in the national economy. (Tr. 41-42). The third hypothetical added to those limitations already set forth in the first two hypotheticals the further limitation that the individual would be "off task, at the very least, twenty-five percent of the work-day." (Tr. 42). The vocational expert testified that this person would not be employable. (Id.). Hume argues that the ALJ erred in relying upon the second hypothetical posed to the vocational expert as it did not consider all of her limitations, and in not referencing the third hypothetical, which was supported by Hume's testimony and Dr. Alderson's opinion. (Docket #11 at 7).

"In order for a vocational expert's testimony to constitute substantial evidence, the vocational expert's opinion must be in response to a hypothetical that accurately describes the claimant's impairments." Cohen v. Astrue, 851 F. Supp. 2d 277, 284 (D. Mass. 2012) (citing

---

[9] Hume incorrectly states that the ALJ based his finding that Hume was not disabled on the first hypothetical posed to the ALJ. (Docket #11 at 7). The second hypothetical posed by the ALJ contained all the limitations outlined in the first hypothetical with the additional restrictions that the individual should not be around flashing lights or in loud, noisy environments. (Tr. 42). These added limitations are included in the RFC the ALJ determined Hume possessed. (Tr. 10).

14

Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982)); see Aho v. Comm'r of Soc. Sec., No. 10-40052-FDS, 2011 U.S. Dist. LEXIS 8840, at *18 (D. Mass. Aug. 10, 2011) ("When presenting a hypothetical to a vocational expert, the question 'must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant.'") (quoting Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996)).

The second hypothetical posed to the vocational expert was based on an accurate RFC. As discussed in the first section of this analysis, Dr. Alderson's assessment of Hume's RFC was not entitled to controlling weight and substantial evidence exists to support the ALJ's assessment of Hume's RFC. Therefore, the ALJ did not err in relying on the second hypothetical posed to the vocational expert.

IV. CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that Plaintiff's Motion to Remand (Docket #10) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #13) be ALLOWED.[10]

/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[10] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).